1

2

3                                                                O

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10

11  MICHAEL T. AGUILAR,        )    Case No. EDCV 07-1001-VAP
                               )    (JCx)
12              Plaintiff,     )
                               )    **[Motion filed on December
13      v.                     )    15, 2008 ]**
                               )
14  OMNITRANS, STEVE           )    **ORDER DENYING MOTION FOR
    OKAMURA,                   )    SUMMARY JUDGMENT**
15                             )
                Defendants. )
16  _____)

17      Defendants' Amended Motion for Summary Judgment or in

18  the Alternative for Summary Adjudication ("Mot.") came

19  before the Court for hearing on January 12, 2009.  After

20  reviewing and considering all papers filed in support of,

21  and in opposition to, the Motion, as well as the

22  arguments advanced by counsel at the hearings, the Court

23  DENIES the Motion.

24

25                      **I. BACKGROUND**

26  **A.   Procedural History**

27      Plaintiff Michael Aguilar ("Plaintiff") named Steve

28  Okamura ("Okamura") and Omnitrans (collectively,

"Defendants") in a complaint filed August 10, 2007
asserting claims stemming from events in October 2006.
In December 2007, the Court denied Defendants' Motion to
Dismiss or for a More Definite Statement and struck the
prayer for punitive damages.  In June 2008, the Court
denied Plaintiff's Motion to Stay and granted in part and
denied in part Defendants' Motion for Judgment on the
Pleadings.  The only claims now remaining allege
violations of 28 U.S.C. section 1983 based on violations
of the First and Fourth Amendments to the U.S.
Constitution.

     Defendants filed their Motion on December 15, 2008
with supporting documents.  Plaintiff filed his
Opposition on December 23, 2008 with supporting
documents.  Defendants filed their Reply on December 30,
2008.

**B.   Evidentiary Objections**

     Defendants filed two sets of evidentiary objections:
Defendants' objections to the Declaration of William J.
Flynn ("Flynn Decl.") and Defendants' Objections to the
Declaration of Michael T. Aguilar ("Pl.'s Decl.").

     The Court overrules all objections to the Flynn
Declaration as they pertain to materials on which the
Court did not rely.

The Court overrules both objections to Plaintiff's Declaration; Plaintiff established he has personal knowledge of the attached flyer and the defense's accusation of discovery violation lacks merit.

**C.   Facts**

   **1.   The parties**

      **a.   Plaintiff**

Omnitrans, a public entity, has employed Plaintiff as a bus driver since approximately 2002.  (Defendants' Statement of Uncontroverted Material Facts ("DSUF") 1; Declaration of Paul Scott Graham ("Graham Decl.") ¶ 4.) Plaintiff is a member of the executive board of Amalgamated Transit Union Local 1704 ("the union").

      **b.   Omnitrans**

Plaintiff's suit names Omnitrans as well as Okamura, an Omnitrans employee.

         **i.   Graham**

Since February 2006, Paul Scott Graham ("Graham") has been the Director of Operations of Omnitrans.  (Graham Decl. ¶ 4.)  As of October 23, 2006, Graham was Plaintiff's supervisor.  (See DSUF 68.)

### ii. Stanley

Doug Stanley ("Stanley") is Omnitrans manager of transportation.  (Graham Decl. ¶ 17.)

### iii. Okamura

Okamura is the safety and regulatory compliance manager for Omnitrans.  (Deposition of Steven Okamura ("Okamura Dep.") 5, at Defs.' Ex. M.)  His duties are to "[o]versee all safety, security, regulatory compliance and emergency preparedness" for Omnitrans.  (Okamura Dep. 5.)

### 2.   Events of October 23, 2006

#### a.   Plaintiff's union activity

On October 23, 2006, Plaintiff was not in uniform, was off-duty, and was on Workers' Compensation leave. (DSUF 74-75.)  Plaintiff and union president Dale Moore ("Moore") went to drivers' rooms at Omnitrans' East Valley and West Valley facilities, respectively.  (DSUF 2, 35; Opp'n 2.)  They did not ask permission before they arrived and entered.

The East Valley facility has a television room, quiet room, lunch room, outside patio, and drivers' assembly room ("drivers' room").  (DSUF 27.)  The drivers' room is closed to the public and one must have a key badge to gain entry to it.  (DSUF 13.)  Drivers prepare for their

4

1  routes, do paperwork, and do other activities in the

2  drivers' room.  It does not contain a kitchen sink,

3  microwave, refrigerator, vending machine, or place to

4  store food.  Reflecting its various uses, however, it

5  contains magazines or reading materials for employees.

6  (DSUF 23, Deposition of Michael Aguilar ("Pl.'s Dep.")

7  104:13-14 at Flynn Decl. Ex. I.)

8

9       Plaintiff went to the East Valley drivers' room to

10  inform union members the union was increasing dues.  (See

11  DSUF 3, Pl.'s Dep. 102-03, 201 at Defs.' Ex. I.)  He

12  spoke to about ten employees and did not discuss any

13  appeals or grievances as defined by Article 18 of the

14  Memorandum of Understanding ("MOU") between Omnitrans and

15  the union, which governs union access to on-duty

16  employees.[1]  (DSUF 3; Pl.'s Dep. 103, at Ex. I; Defs.'

17

18  _____

19       [1]Article 18 of the MOU, "Access to On Duty
    Employees," states:

20            Reasonable time and access to on duty
         employees shall be granted officers of

21         the [union] and their officially
         designated representatives for the

22         purpose of processing grievances or
         appeals only.

23         Such officers or representatives shall

24         not access an on duty employee without
         first advising the Department Head or

25         designee.  Access may be restricted or
         denied so as not to interfere with the

26         normal operations or with established
         safety or security requirements.  Should

27         such access be denied, a mutually
         agreeable meeting shall be arranged.

    (Defs.' Ex. D.)

28

Ex. D.)  He brought a flyer to distribute; a copy of
which he did not retain but which he described at his
deposition as "an explanation of the increase in union
dues . . . anything to do with any laws or information
that our members needed."  (Pl.'s Dep. 201:8-12.)  The
flyer Plaintiff later identified as the one he
distributed states the union was increasing dues because
of a series of disputes with Omnitrans.  (See Pl.'s Decl.
Ex. A.)  For example, the flyer stated management in the
past treated the union "[u]nfair[ly] and unjust[ly]. . .
."  (Pl.'s Decl. Ex. A.)

Plaintiff spoke two to four times that day with David
Patton ("Patton"), a bus driver on standby duty and a
union member.  (Deposition of David Patton ("Patton
Dep.") 8, 10, 14, 18 at Defs.' Ex. J.)  At some time
after Patton's first conversation with Plaintiff, Patton
forgot to pick up a mail bag from a bus.  (Patton Dep.
21:4-20.)  Patton did not realize he had forgotten to
pick up the mail bag until more than a half hour passed.
(Patton Dep. 21.)  The next opportunity to perform this
task occurred 15 minutes later, and Patton was not
reprimanded for the delay.  (Statement of Genuine Issues
in Opposition to Motion for Summary Judgment ("SGI")
(E)(1)-(2).)

1                    **b.   Defendants ask Plaintiff to speak with**
2                         **Graham or leave**

3        Stanley, a supervisor, saw Plaintiff in the drivers'
4    room and believed Plaintiff was doing union business.  He
5    went to Graham and told him an off-duty employee was in
6    the drivers' room talking about meal and rest periods,
7    and being disruptive.  (SGI (F)(1); see Graham Decl. ¶
8    17.)  Graham did not want Plaintiff to discuss meal and
9    rest breaks because he thought it was too controversial.
10   (See Flynn Decl. Ex. B. 121:11-28, 128:18-24.)

11

12       Stanley went to the drivers' room to speak with
13   Plaintiff and brought with him a copy of Article 18,
14   which he asked Plaintiff to read.  (DSUF 77.)  He then
15   asked Plaintiff to leave; Plaintiff simply sat, giving
16   the impression he was going stay.  (DSUF 79, 80; Pl. Dep.
17   193.)

18

19       Next, Stanley reported back to Graham Plaintiff's
20   refusal to leave.  (DSUF 83.)  Graham telephoned Okamura
21   for assistance, telling Okamura that Plaintiff "was off
22   duty, violating company policy, and that he was not
23   leaving after being requested to do so by Mr. Stanley."
24   (Graham Decl. ¶ 18; DSUF 83; Okamura Dep. 9 at Defs.' Ex.
25   M.)

26

27

28

After Graham called Okamura, Graham received a call from Moore, the union president who was at the West Valley facility doing union business.  (DSUF 84.)  Moore had been approached by a management representative who asked him to leave.  He refused but was not arrested. (Flynn Decl. Ex. A 42-45.)  Moore told Graham that Plaintiff "was in the East Valley Division to talk to employees about an increase in union dues . . . ." (Graham Decl. ¶ 18.)  Graham told Moore that he "did not have a problem" with the union talking to members about union dues but that he had conflicting information about what Plaintiff was talking about and he wanted to speak with Plaintiff.  (DSUF 84; Graham Decl. ¶ 18.)

Okamura arrived at East Valley at about 1:00 p.m. (Okamura Dep. 8 at Defs.' Ex. M; DSUF 129.)  Graham instructed Okamura to ask Plaintiff to come speak with Graham in his office.  (Graham Decl. ¶ 19, DSUF 72, 87.) Okamura "was not advised" Plaintiff had come to the drivers' room to speak with other drivers.  (DSUF 155.) According to Okamura, Graham told him that if Plaintiff refused to leave, "based off of the MOU" he should contact the police.  (Okamura Dep. 28:8-12.)

Okamura told Ronda Rithmire ("Rithmire"), safety specialist, to speak with Plaintiff.  (DSUF 130.) Plaintiff ignored Rithmire.  (DSUF 130.)

1  Okamura then went to the drivers' room and told

2  Plaintiff Graham wanted to speak to him in his office,

3  which was close to the drivers' room.  (DSUF 88, 90.)

4  Plaintiff replied Graham could come to the drivers' room.

5  (DSUF 72, 88; Okamura Dep. 12-13 at Defs.' Ex. M.)

6  According to Okamura, he told Plaintiff to leave if he

7  would not speak with Graham.  (Graham Decl. ¶ 19 and

8  Okamura Dep. 13:18-20.)

9

10  Okamura reported back to Graham and then arranged for

11  the San Bernardino police to be called.  (Graham Decl. ¶

12  21; DSUF 92; Okamura Dep. 15-16 at Defs.' Ex. M.)

13  Approximately two hours elapsed before their arrival.

14  (Graham Decl. ¶ 22; Okamura Dep. 16:18-20 at Defs.' Ex.

15  M.)  During that time, Plaintiff left the drivers' room

16  and put his laptop in his car because he believed he

17  might be arrested.  He returned to the drivers' room.

18  (DSUF 154, 156.)

19

20  **c.   San Bernardino police department arrives**

21  When the police arrived, Okamura and Rithmire brought

22  one of the officers, Shaun Jarvis ("Jarvis"), to the

23  drivers' room.  (Okamura Dep. 21:17-25 at Defs.' Ex. M.)

24  Jarvis went inside and approached Plaintiff, asking him

25  if they could talk in the hallway.  (Deposition of Shaun

26  Jarvis ("Jarvis Dep.") 12:11-15 at Defs.' Ex. J; Okamura

27

28

1  Dep. 22.)  Plaintiff refused and stated he would not
2  leave.  (Jarvis Dep. 12:11-15; 12-13.)

3

4      According to Jarvis, Plaintiff was "angry" and
5  "loud."  (Jarvis Dep. 13.)  Jarvis was concerned about
6  his safety and the safety of others in the drivers' room.
7  (Jarvis Dep. 14.)  Jarvis decided to place Plaintiff in
8  handcuffs and escorted him out of the building.  Jarvis
9  and another officer sat him down outside, still
10 handcuffed.  According to Jarvis, Plaintiff remained
11 "loud" and "irate."  (Jarvis Dep. 12-14, 17, 19:11-18 at
12 Defs.' Ex. J; see DSUF 93.)

13

14     Graham went outside and spoke with the police.
15 (Graham Decl. ¶ 23.)  The police told Plaintiff
16 Defendants would not press charges if he were willing to
17 leave.  (Jarvis Dep. 20.)

18

19     The parties dispute how Plaintiff responded.
20 According to Defendants, Plaintiff indicated he would go
21 back in; Plaintiff testified at a Public Employment
22 Relations Board ("PERB") hearing he told the police he
23 "had every right to" go back in.  (Compare Jarvis Dep.
24 17:15-16 at Defs.' Ex. J with Flynn Decl. Ex. A 118:13-
25 21, 120:6-18.)

26

27

28

1
2
3
4
5
6
7
8
9
10

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### d.   Okamura arrests Plaintiff

The police then conferred again with Stanley, Graham, and Okamura.  Graham decided to arrest Plaintiff and instructed Okamura to sign the paperwork.  (Okamura Dep. 24-25, 27 at Defs.' Ex. M.)  Okamura placed Plaintiff under citizens' arrest under California Penal Code section 602.1 and "Trespassing."  Plaintiff spent the night in jail.  (Opp'n 2; Pl.'s Dep. 160-61 at Flynn Decl. Ex. F.)

Defendants did not initiate formal discipline against Plaintiff for his behavior, nor communicate with the union about discipline.  (DSUF 5-7.)

### 3.   Omnitrans' rules

As of October 23, 2006, several Omnitrans rules were in place governing meetings of employees, visits to Omnitrans property, and the union's access to on-duty employees.  According to Defendants, Plaintiff's actions violated these rules.

Section 1.23 of the Omnitrans Rules and Regulations forbade employees from meeting on Omnitrans property without the written permission of the General Manager. (Defs.' Ex. A 10.)  Unauthorized use of Omnitrans' equipment or facilities also was a violation of

1 Omnitrans' general rules and procedures.  (Defs.' Ex. A

2 26 § 7.23.)

3

4      Policy 1004(III)(D) of the Omnitrans Personnel Policy

5 Manual governed visits to Omnitrans:

6            Visits to the Agency by friends, family,
             or acquaintances of employees and off-
7            duty employees are not encouraged, and
             are not permitted in work areas.  Should
8            it be necessary for a friend or relative
             to speak with an employee during work
9            hours, the individual must check in with
             the Receptionist and remain in the lobby
10           until a short visit can be arranged with
             the appropriate Omnitrans employee.

11

12 (Defs.' Ex. B.)  Defendants read this policy to forbid

13 visits by off-duty employees to Omnitrans' work areas.

14

15      Article 18 of the MOU governed the union's access to

16 on-duty employees:

17           Reasonable time and access to on duty
             employees shall be granted officers of
18           the  [union]  and  their  officially
             designated  representatives  for  the
19           purpose  of  processing  grievances  or
             appeals only.

20
             Such officers or representatives shall
21           not access an on duty employee without
             first advising the Department Head or
22           designee.  Access may be restricted or
             denied so as not to interfere with the
23           normal operations or with established
             safety or security requirements.  Should
24           such  access  be  denied,  a  mutually
             agreeable meeting shall be arranged.

25

26 (Defs.' Ex. D.)

27

28

1    Defendants assert that Plaintiff violated Article 18
2  and the other rules above through his visit.  Defendants
3  produce evidence that, after the promulgation of Article
4  18, the union sought permission from Omnitrans to twice
5  conduct votes on union business in "quiet rooms" on
6  Omnitrans property and once in a "workroom."  (Defs.' Ex.
7  E, F.)  The quiet room is not the same as the drivers'
8  room and therefore does not show the pattern of use of
9  the drivers' room.  It is not clear what the "workroom"
10  is.  Defendants direct the Court to no proof that
11  Omnitrans, as a matter of course, asked off-duty officers
12  to leave the drivers' room.

13

14    **4.   Enforcement of Omnitrans' rules**

15    Plaintiff adduces evidence Omnitrans did not
16  enforce the above rules (1) to bar the union from
17  conducting business on Omnitrans' property without
18  permission and (2) that Omnitrans allowed employees to
19  engage in a variety of activities in the drivers' room
20  unrelated to their work.

21

22    Plaintiff produces proof the union used Omnitrans
23  property on other occasions without first asking
24  permission.  For example, when the union held a vote on
25  Defendants' property in 2005 without seeking the
26  permission of Omnitrans' then-director beforehand, she
27  confronted the union but permitted the vote to go
28

1  forward.  (Flynn Decl. Ex. A 184-85.)  Also, union

2  official Lucius Tyson ("Tyson") testified at a PERB

3  hearing that, three weeks before the events in question,

4  he sat in the drivers' room at West Valley out of uniform

5  from eight a.m. until seven p.m., doing union business.

6  (Flynn Decl. Ex. C 19:2-20:7, 21:17-21).  He notified the

7  dispatcher about his activity in the drivers' room but

8  this was not tantamount to obtaining permission from a

9  Department Head as required by Article 18.  (See Defs.'

10  Ex. D.)

11

12     Furthermore, according to Plaintiff's evidence,

13  employees were not required to be working while they were

14  in the drivers' room and they were not disciplined for

15  failure to work while present there.  (SGI (A)(2)-(9).)

16  Indeed, Stanley testified at a PERB hearing that drivers

17  were permitted to remain in the drivers' room, in

18  uniform, while off the clock, and that he has seen such

19  drivers remain in the drivers' room for more than half an

20  hour reading a newspaper or speaking with a colleague.

21  (Flynn Decl. Ex. B 71:17-21, 46:8-13.)

22

23     Other evidence supports Plaintiff's contention that

24  the drivers' room was not used exclusively for work

25  purposes.  Rather, Omnitrans permitted Moore to sell and

26  distribute "Princess House Crystal" in the East Valley

27  drivers' room as late as the latter part of 2005,

28

1  including to Omnitrans management; others sold Girl Scout

2  cookies in the drivers' room.   (SGI (A)(10); Flynn Decl.

3  Ex. C 42-45, 50.)

4

5                        **II. LEGAL STANDARD**

6      A motion for summary judgment shall be granted when

7  there is no genuine issue as to any material fact and the

8  moving party is entitled to judgment as a matter of law.

9  Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>,

10  477 U.S. 242, 247-48 (1986).   The moving party must show

11  that "under the governing law, there can be but one

12  reasonable conclusion as to the verdict."  <u>Anderson</u>, 477

13  U.S. at 250.

14

15      Generally, the burden is on the moving party to

16  demonstrate that it is entitled to summary judgment.

17  <u>Margolis v. Ryan</u>, 140 F.3d 850, 852 (9th Cir. 1998);

18  <u>Retail Clerks Union Local 648 v. Hub Pharmacy, Inc.</u>, 707

19  F.2d 1030, 1033 (9th Cir. 1983).   The moving party bears

20  the initial burden of identifying the elements of the

21  claim or defense and evidence that it believes

22  demonstrates the absence of an issue of material fact.

23  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

24

25      Where the non-moving party has the burden at trial,

26  however, the moving party need not produce evidence

27  negating or disproving every essential element of the

28

                               15

1  non-moving party's case.  <u>Celotex</u>, 477 U.S. at 325.

2  Instead, the moving party's burden is met by pointing out

3  that there is an absence of evidence supporting the non-

4  moving party's case.  <u>Id.</u>

5

6     The burden then shifts to the non-moving party to

7  show that there is a genuine issue of material fact that

8  must be resolved at trial.  Fed. R. Civ. P. 56(e);

9  <u>Celotex</u>, 477 U.S. at 324; <u>Anderson</u>, 477 U.S. at 256.  The

10  non-moving party must make an affirmative showing on all

11  matters placed in issue by the motion as to which it has

12  the burden of proof at trial.  <u>Celotex</u>, 477 U.S. at 322;

13  <u>Anderson</u>, 477 U.S. at 252.  <u>See also</u> William W.

14  Schwarzer, A. Wallace Tashima & James M. Wagstaffe,

15  <u>Federal Civil Procedure Before Trial</u> § 14:144.

16

17     A genuine issue of material fact will exist "if the

18  evidence is such that a reasonable jury could return a

19  verdict for the non-moving party." <u>Anderson</u>, 477 U.S. at

20  248.  In ruling on a motion for summary judgment, the

21  Court construes the evidence in the light most favorable

22  to the non-moving party.  <u>Barlow v. Ground</u>, 943 F.2d

23  1132, 1135 (9th Cir. 1991); <u>T.W. Electrical Serv. Inc. v.</u>

24  <u>Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630-31

25  (9th Cir. 1987).

26

27

28

# III. DISCUSSION

**A.   Freedom of Speech**

To state a claim for retaliation in violation of the First Amendment, a public employee must adduce proof of the following: "(1) that he or she engaged in protected speech; (2) that the employer took 'adverse employment action'; and (3) that his or her speech was a 'substantial or motivating factor' for the adverse employment action." Coszalter v. City of Salem, 320 F.3d 968, 973 (9th Cir. 2003) (internal quotations and citations omitted); see also Ulrich v. City & County of San Francisco, 308 F.3d 968, 976 (9th Cir. 2002);(Mot. 4:16-20; Opp'n 16-17.)

> Upon these showings, the burden shifts to the public employer to demonstrate either that, under the balancing test established by Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968), its legitimate administrative interests outweighed [plaintiff's] First Amendment rights or that, under the mixed motive analysis established by Mt. Healthy City Sch. Dist. v. Doyle, 429 U.S. 274, 287 (1977), it would have reached the same decision even in the absence of the plaintiff's protected conduct.

Ulrich, 308 F.3d 968, 976-77 (9th Cir. 2002); (see also Opp'n 18:7-13.)

1   **1.   Plaintiff's prima facie case**

2   **a. Protected speech**

3   Plaintiff has the burden of producing evidence that

4   his speech was protected.  <u>Coszalter</u>, 320 F.3d at 973;

5   (Mot. 5:2-3 citing <u>Mt. Healthy</u>, 429 U.S. 274, 283-84.)

6

7

8   A public employee's speech is protected if the

9   employee speaks "as a citizen upon matters of public

10  concern" rather than "as an employee upon matters only of

11  personal interest . . . ."  <u>Connick v. Myers</u>, 461 U.S.

12  138, 147 (1983).  "Whether an employee's speech addresses

13  a matter of public concern must be determined by the

14  content, form, and context of a given statement, as

15  revealed by the whole record."  <u>Id.</u> at 147-48.  Speech

16  "may be characterized as not of 'public concern' when it

17  is clear that such speech deals with individual personnel

18  disputes and grievances and that the information would be

19  of no relevance to the public's evaluation of the

20  performance of governmental agencies."  <u>McKinley v. City</u>

21  <u>of Eloy</u>, 705 F.2d 1110, 1114 (9th Cir. 1983).  "On the

22  other hand, speech that concerns 'issues about which

23  information is needed or appropriate to enable the

24  members of society' to make informed decisions about the

25  operation of their government merits the highest degree"

26  of First Amendment protection.  <u>Id.</u> (quoting <u>Thornhill v.</u>

27  <u>Alabama</u>, 310 U.S. 88, 102 (1940)).

28

Plaintiff has satisfied the first prong of the prima facie case by proffering evidence the dues increase was tied to a labor dispute, a matter of public concern. (See Opp'n 19); see Thornhill, 310 U.S. at 102 ("In the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution.").   The flyer explicitly ties increased union dues to labor friction: "In the past we were able to keep costs down by accepting unfair and unjust treatment at the hands of CEO/GM Durand Rall and his managers."   It describes issues in dispute, asserting the union has "the right to determine what Union business is, how it should be conducted, and when." It proposes action: "We have to defend ourselves and any other member for that matter."   The flyer also asserts Defendants are trying to win through attrition: "Omnitrans' strategy seems to be 'they [the union] will run out of money sooner or later.'"   The Court need not verify these statements to find Plaintiff has satisfied the first element of the prima facie case, i.e., that his speech concerned not purely personal matters but issues of public concern.   See Connick, 461 U.S. at 147-49; Coszalter, 320 F.3d at 973.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**b.   Adverse employment action**

Plaintiff may state a claim under section 1983 by setting forth proof he suffered an adverse employment action.   Here, Plaintiff was not disciplined, and Defendants therefore claim he suffered no adverse employment action.

Nevertheless, Plaintiff suffered an adverse employment action at Defendants' hands.   In Coszalter, the Ninth Circuit made clear retaliation can occur even when the government's actions are not neatly packaged as a deprivation of a valuable government benefit or privilege.   Coszalter, 320 F.3d at 974.   Rather, a plaintiff may "establish a valid claim under § 1983" if he "can establish that the actions taken by the defendants were reasonably likely to deter [him] from engaging in protected activity . . . "   Id., 320 F.3d at 976 (internal quotations omitted).

> The precise nature of the retaliation is not critical to the inquiry in First Amendment retaliation cases.   The goal is to prevent, or redress, actions by a government employer that 'chill the exercise of protected' First Amendment rights. . . Depending on the circumstances, even minor acts of retaliation can infringe on an employee's First Amendment rights.

_Id._, 320 F.3d at 975.  "[T]he relevant inquiry is whether the state had taken 'action designed to retaliate against and chill political expression.'"  _Id._, 320 F.3d at 975.

Of course, not all retaliatory action constitutes an adverse employment action.  "In some cases, the would-be retaliatory action is so insignificant that it does not deter the exercise of First Amendment rights, and thus does not constitute an adverse employment action within the meaning of the First Amendment retaliation cases." _Id._, 320 F.3d at 975.  For example being "bad-mouthed and verbally threatened" will not suffice.  _Id._, 320 F.3d at 975.

Here Plaintiff asserts he was asked to leave based on his speech.  He proffers Graham's testimony at a PERB hearing that he would have permitted Plaintiff to talk about union dues but not about meal and rest breaks. (Flynn Decl. Ex. B 128.)  This tends to show Defendants sought to chill a particular kind of speech.  Defendants have not produced evidence they asked other off-duty employees to leave, while Plaintiff produced proof Defendants permitted a wide variety of off-duty, non-work-related conduct in the drivers' room, from newspaper-reading, to speaking with fellow employees, to selling cookies and crystal.  (Flynn Decl. Ex. A 32, 39-40, 87, 127; Ex. B 46; Ex. C 42-45, 50.)

Accordingly, construing the evidence in favor of the non-moving party, Plaintiff has succeeded in raising a triable issue of fact whether Defendants' actions were designed to chill protected speech.  Plaintiff has met his burden as to the second element of his prima facie case, the "adverse employment action."

### c.   Substantial or motivating factor

The third step in the First Amendment analysis is determining whether Plaintiff has raised a triable issue of fact as to whether the protected speech was a substantial or motivating factor for Defendants' acts.  A plaintiff may raise an inference that "retaliation was a substantial or motivating factor behind a defendant's adverse employment actions" by "introduc[ing] evidence regarding the 'proximity in time between the protected action and the allegedly retaliatory employment decision'."  Coszalter, 320 F.3d at 977.  A plaintiff may also create a triable issue of fact by showing "his employer expressed opposition to his speech, either to him or to others" or that "his employer's proffered explanations for the adverse employment action were false and pretextual."  Id.

Here, Plaintiff's speech and the retaliatory action occurred within hours of each other.  Plaintiff has

22

1    brought forth sufficient information to satisfy the

2    proximity test.  See id.(finding three to eight months as

3    "within a time range that can support an inference of

4    retaliation.")[2]

5

6

7        As demonstrated above, Plaintiff has made a prima

8    facie case of retaliation in violation of the First

9    Amendment.  He has produced evidence that (1) his speech

10   was protected, (2) he suffered an adverse employment

11   action and (3) his action was a substantial factor in

12   Defendants' decisions.  The burden now shifts to

13   Defendants to rebut Plaintiff's prima facie case by

14   producing evidence (4) their interest in promoting

15   efficiency outweighed Plaintiff's interests or (5) they

16   would have reached the same decision even in the absence

17   of Plaintiff's protected conduct.

18

19

20

21

22   _____

23       [2]Plaintiff may also be able to raise an inference of
     retaliation by showing uneven enforcement of policies.
24   In Coszalter, the Ninth Circuit found "[a] reasonable
     fact finder could find from the inconsistent application
25   of the cellular phone policy that the defendants'
     motivation for enforcing the policy (if there even was
26   such a policy) against Coszalter was retaliation for his
     constitutionally protected speech." Coszalter 320 F.3d at
27   978.  Here, Plaintiff has adduced evidence showing uneven
     enforcement of several policies.
28

## 2.   Defendants' rebuttal

### a.   Defendants' interest in promoting efficiency

Under <u>Pickering</u>, Defendants may defeat Plaintiff's prima facie case if they bring forth proof their legitimate interests outweighed Plaintiff's First Amendment rights.  <u>See</u> <u>Ulrich</u>, 308 F.3d at 976-77 (discussing <u>Pickering</u> standard).

Defendants claim they have a strong interest in promoting efficient public transportation and that their workplace rules promote this by requiring a quiet drivers' room.  (Mot. 10, 12; Reply 12-13.)  According to Defendants, Plaintiff impaired this efficiency by distracting Patton from his duties, i.e., retrieving a mail bag.  (Mot. 12.)  Patton's testimony, however, is equivocal about whether he was speaking with Plaintiff at the moment he was to pick up the mail.  (<u>See</u> Opp'n 23-24; <u>compare</u> Patton Dep. 15:13-17, 21 at Defs.' Ex. J (does not know whether he was speaking with Plaintiff when he was supposed to pick up mail bag) <u>with</u> Patton Dep. 31:20-22 (Patton can state with certainty he was not speaking with Plaintiff when he was to pick up mail bag).)  Defendants also fail to direct the Court to evidence their efficiency interest was sufficiently strong that they enforced a policy of forbidding off-duty employees to use the drivers' room as a matter of course.

In contrast to Defendants' poor showing, Plaintiff produces evidence the drivers' room often was used for non-work, off-duty activities, as discussed above. (<u>See</u> Opp'n 21-22.)   This precludes the Court from determining at the summary judgment stage Defendants' interests outweighed Plaintiff's First Amendment rights.

### b.   Role of Plaintiff's speech in Defendants' decision

In the alternative, under <u>Mt. Healthy</u>, 429 U.S. 274 (1977), Defendants may prevail at the summary judgment stage by making a showing that they would have reached the same decision in any event.   <u>Ulrich</u>, 308 F.3d at 981 (discussing <u>Mt. Healthy</u>).   The <u>Mt. Healthy</u> court stated: "[t]he constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct."   <u>Mt. Healthy</u>, 429 U.S. at 285-86.

Defendants claim Plaintiff's "irrational behavior," not his protected speech, led to his arrest.   (Mot. 14; Reply 16.)   They emphasize that Moore discussed union dues at West Valley, was told to leave, refused to do so, called Graham, and was not arrested.   (Reply 16-17.)

The evidence presented by Plaintiff supports a reasonable inference that the only persons asked either to speak to management or leave were those engaged in union activity.  Defendants have not produced evidence Plaintiff is in "no worse a position than if he had not engaged in" union activity in the drivers' room.  See Mt. Healthy, 429 U.S. at 285-86; Ulrich, 308 F.3d at 981. Accordingly, Defendants have not carried their burden of showing they would have reached the same decision even had Plaintiff been discussing personal, rather than union, business in the drivers' room in October 2006.

A triable issue of fact remains as to whether Defendants would have reached the same conclusion even in the absence of Plaintiff's protected conduct.  See Mt. Healthy, 429 U.S. at 285-86; Ulrich, 308 F.3d at 981. The Court DENIES the Motion as to Plaintiff's Fourth Amendment claim.

**3.   Qualified Immunity for Okamura as to the First Amendment claim**

Okamura held the title of Omnitrans safety and regulatory compliance manager in October 2006.  (Okamura Dep. 5 at Defs.' Ex. M.)  His duties were to "[o]versee all safety, security, regulatory compliance and emergency preparedness" for Omnitrans.  (Okamura Dep. 5.)

1    Government officials are entitled to qualified
2 immunity from civil damage claims unless their conduct
3 violates "clearly established constitutional rights of
4 which a reasonable person would have known." Harlow v.
5 Fitzgerald, 457 U.S. 800, 818 (1982).  The Court proceeds
6 by first asking (1) whether the law governing the
7 official's conduct was clearly established at the time of
8 the conduct; and, if so (2) whether under that law a
9 reasonable official could have believed the conduct was
10 lawful.  See Pearson v. Callahan, No. 07-751, slip op. at
11 6, 10 (___ U.S.___ 2009).  While it is Plaintiff's burden
12 to make a showing under the first prong, it is the
13 government's burden to adduce evidence as to the second.
14 DeNieva v. Reyes, 966 F.2d 480, 485-86 (9th Cir. 1992).
15
16           **a.   Clearly established right**
17
18    Under Coszalter, by 2000, "the constitutional
19 protection of employee speech and a First Amendment cause
20 of action for retaliation against protected speech were
21 clearly established." Coszalter, 320 F.3d at 979.  The
22 events in question took place in 2006.  The first prong
23 is satisfied.
24
25           **b.   Reasonable officer**
26
27    The evidence before the Court supports the inference
28 Okamura knew of Plaintiff's union activity.  Okamura gave

a statement to Jarvis, which appears in the police report provided by Defendants, in which he stated Rithmire told him Plaintiff was conducting union activity. (Defs.' Ex. G.)[3]  Also, Okamura had the opportunity to learn of the union activity in the approximately two hours that passed between when Okamura had the police called and their arrival.  During that time, Okamura discussed the reason for Plaintiff's arrest with Stanley and Graham, who knew of the union activity. (See Okamura Dep. 24-25, 27, 32:5-18 at Defs.' Ex. M.)

    With the knowledge Plaintiff was engaged in union activity, a reasonable officer would know it was illegal to enforce selectively Omnitrans' rules against him. Accordingly, the Court DENIES the Motion as to qualified immunity for Okamura on Plaintiff's First Amendment freedom of speech claim.

**B.   Freedom of Association**

    Defendants move for summary adjudication on any claim by Plaintiff regarding violation of his First Amendment right to association.  Defendants assert Plaintiff

---

    [3]The Court considers Okamura's statement in the police report because Plaintiff could call Jarvis to testify to Okamura's statement at trial.  See Fonseca v. Sysco Food Services of Arizona, 347 F.3d 840, 846 (9th Cir. 2004) (when considering motion for summary judgment district court erred when it excluded evidence that could have been presented in an admissible form at trial).

suffered no adverse employment action and that
Plaintiff's allegedly protected activity was not a
substantial motivating factor in Defendants' decision.
Both of these arguments lack merit.  Plaintiff suffered
an adverse employment action and a material issue of fact
remains as to the motivation for Defendants' action.

     Defendants have not carried their burden regarding
any First Amendment Freedom of Association claim.  The
Court DENIES the Motion as to any Freedom of Association
claim.

**C.   Fourth Amendment**

     Plaintiff asserts his seizure violated the Fourth
Amendment.  To prevail at trial, Plaintiff would have to
show he was arrested without probable cause; accordingly,
as the non-moving party, Defendants may carry their
burden at the summary judgment stage by showing they had
probable cause to seize Plaintiff.  See Devenpeck v.
Alford, 543 U.S. 588, 592-93 (2004).[4]

-------

[4] Plaintiff asks the Court to examine his Fourth
Amendment claim using the excessive force standard
provided in Santos v Gates, 287 F.3d 846, 853 (9th Cir.
2002).  (Opp'n 13-14.)  Here, however, Plaintiff provides
no evidence any Defendant touched him or that Defendants
prevented him from leaving.  Instead, his own testimony
establishes he left the drivers' room, went to his car,
and returned to the drivers' room before the police
arrived.  Plaintiff has only established Defendants
called the police, who took him outside, and that
                                        (continued...)

Officers have probable cause when they have "knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." Torres v. City of Los Angeles, 548 F.3d 1197, 1206 (9th Cir. 2008) (see Mot. 15; Reply 20:15-18.)  An arrest complies with the Fourth Amendment although the arresting officer incorrectly identifies, at the time of the arrest, the offence for which he has probable cause to arrest. Devenpeck, 543 U.S. at 594-95 (finding officer named in § 1983 suit had probable cause to arrest when, although officer stated the arrest was for recording conversation with police officer, which was not a crime, he also had probable cause to arrest for impersonating a police officer, which was a crime).  In other words, "probable cause supports an arrest so long as the arresting officer[] had probable cause to arrest the suspect for any criminal offense, regardless of the[] stated reason for the arrest." See Torres, 548 F.3d at 1207 (discussing probable cause in § 1983 suit).[5]

_____

[4](...continued)
Defendants had him placed under citizen's arrest. Plaintiff did not name the police officers as Defendants. Accordingly, the Court declines to examine this case using an excessive force standard.

[5]The California Court of Appeal reached the same result in authority on which Defendants rely, Gomez v. Garcia, 112 Cal. App. 3d 392, 398 (1980).  The Court of (continued...)

1    Here, Defendants assert they had probable cause
2  because they believed Plaintiff violated California Penal
3  Code section 602.1, "[o]bstructing or intimidating
4  business operators, public agencies or customers. . . ",
5  or in the alternative, violating California Penal Code
6  section 602 "[t]respasses constituting misdemeanors. . .
7  ."

8

9    **1.   Section 602.1**

10

11    Defendants mistakenly assert they had probable cause
12  to arrest Plaintiff under California Penal Code section
13  602.1.  That statute cannot apply here.  (<u>See</u> Mot 15-16.)
14  Section 602.1 applies only to business or public agencies
15  "open to the public . . . ."  Cal. Pen. Code § 602.1(b).[6]
16  Defendants repeatedly assert their employees knew which
17  areas were open to the public and that the drivers' room
18  was not open to the public.  Accordingly, section 602.1
19  cannot apply.

20  _____

21    [5](...continued)
    Appeal found the trial court erred when it instructed the
22  jury that the detention of the plaintiff was without
    probable cause if it was not shown the plaintiff had
23  violated California Penal Code section 415 (disturbing
    the peace), when in fact the plaintiff's testimony
24  established he had violated California Penal Code section
    602 (trespassing).  (Reply 22); <u>Gomez</u>, 112 Cal. App. 3d
25  at 398-399.

26    [6]    Plaintiff also asserts probable cause was
    lacking under section 602.1 because section 602.1(c)
27  exempts from its coverage "lawful labor union activities
    that are permitted to be carried out on the property . .
28  . ."

1

2.  **Section 602(o)**

2

In the alternative, Defendants argue they had

3

probable cause to arrest Plaintiff under California Penal

4

Code section 602(o), which establishes in pertinent part

5

it is a misdemeanor to "wilfully commit[] a trespass" by

6

refusing to leave land belonging to another which is not

7

open to the public.  Nevertheless, it is not clear this

8

section applies, as section 602(o) states it "shall not

9

be applicable to persons engaged in lawful labor union

10

activities which are permitted to be carried out on the

11

property . . . . by the National Labor Relations Act. . .

12

.  "[7]

13

14

Defendants assert they had probable cause to believe

15

Plaintiff committed trespass because (1) he went to the

16

drivers' room, an area not open to the general public,

17

(2) Defendants asked him to leave, and (3) he refused to

18

do so.  (Mot. 22.)  Defendants fail to explain, however,

19

how Plaintiff's activities fell outside of section

20

602(o)'s exclusion of lawful union activity pursuant to

21

the National Labor Relations Act (NLRA).  (See Mot. 15-23

22

(asserting Plaintiff's conduct violated Article 18, that

23

24

25

[7]Contrary to the reading proposed by Plaintiff (see
Opp'n 15 n.12), the Court reads the language in section
602(o) regarding rights protected by the U.S.
Constitution as pertaining only to public housing.
Accordingly, the Court does not discuss protection
afforded Plaintiff by this language.

26

27

28

Plaintiff refused to speak with Graham, but making no mention of the NLRA).)

Defendants have not met their burden of providing evidence they had probable cause to arrest Plaintiff because they have not established section 602(o), or any other section, actually applies.  See Torres, 548 F.3d at 1207 ("probable cause supports an arrest so long as the arresting officer[] had probable cause to arrest the suspect for any criminal offense, regardless of the[] stated reason for the arrest.").  Accordingly, the Court DENIES the Motion as to Plaintiff's Fourth Amendment claim.

### 3.   Qualified immunity for Okamura on Fourth Amendment claim

As discussed above, government officials are entitled to qualified immunity from civil damage claims unless their conduct violates "clearly established constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

### a.   Clearly established right

It is a "well-known and indisputable Fourth Amendment principle" that "officers normally may not seize a person

33

absent probable cause."  <u>Ganwich v. Knapp</u>, 319 F.3d 1115, 1124 (9th Cir. 2003).  Accordingly, the first prong of the qualified-immunity analysis is satisfied.

### b.  Reasonable officer

Okamura has the burden to show a reasonable officer in his position could have believed his conduct was lawful.  <u>See DeNieva</u>, 966 F.2d at 486.

Here Okamura signed an "arrest by private person form" on which Jarvis was the accepting officer.  (Defs.' Ex. G.)  He did so at the direction of Graham and after asking police to see whether Plaintiff would leave in exchange for freedom from arrest.  (<u>See</u> Jarvis Dep. 17; SGI (C)(2); Okamura Dep. 24-25, 27 at Defs.' Ex. M.)

Defendants claim Okamura had probable cause to believe Plaintiff was trespassing because he saw Plaintiff refused to leave.  (Mot. 23; Reply 23-24.)  As discussed above, Defendants fail to show any provision of the California Penal Code could support the arrest. Similarly, Okamura is silent as to whether he reasonably believed his authority exceeded that provided by statute. Accordingly, the Court DENIES the Motion as to qualified immunity for Okamura on Plaintiff's Fourth Amendment claim.

1

**IV. CONCLUSION**

2
    The Court DENIES the Motion.

3

4

5
Dated: <u>February 6, 2009</u>          _Virginia A. Phillips_

6
                                VIRGINIA A. PHILLIPS

7
                    United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28